IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
March 18, 2004 Session

## TONYA PETRECE RAY v. WILLIAM MARTIN RAY v. STEPHEN ERIC STAGGS

**A Direct Appeal from the Circuit Court for Davidson County**
**No. 99D-662     The Honorable Carol Soloman, Judge**

---

**No. M2003-01158-COA-R3-CV - Filed May 18, 2004**

---

Natural father of minor twin children appeals trial court's final order of custody and visitation on multiple grounds, alleging primarily that (1) the trial court erred in awarding visitation to stepfather; (2) the trial court erred in refusing to change children's surname to that of their natural father; and (3) the trial court improperly based its opinion on a sealed psychological report. We affirm in part, reverse in part, and remand.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Circuit Court Affirmed in Part, Reversed in Part and Remanded**

W. FRANK CRAWFORD, P.J., W.S., delivered the opinion of the court, in which ALAN E. HIGHERS, J. and DAVID R. FARMER, J., joined.

Clark Lee Shaw, Nashville, For Appellant, Stephen Eric Staggs

Randle W. Hill, Jr., Nashville, For Appellee, Tonya Petrece Ray (Holland)

John M. L. Brown, Nashville, For Appellee, William Martin Ray

### OPINION

The present case is before this Court for a third time. During the pendency of this litigation, the appellee, Tonya Petrece Ray, has remarried. For the purposes of this appeal, we will refer to Tonya Petrece Ray as "Mrs. Holland." Appellant Stephen Eric Staggs also married , and has since changed his last name to "Moore," taking his wife's maiden name as his own. For the purposes of this appeal, we will refer to Stephen Eric Staggs as "Mr. Moore." As in the previous opinions, we will continue to refer to appellee William Martin Ray as "Mr. Ray."

The pertinent facts and procedural information were aptly summarized by the Middle Section of this Court in the Rule 10 appeal, *Ray v. Ray*, No. M2002-01553-COA-R10-CV, 2002 WL 1466095 (Tenn. Ct. App. July 9, 2002):

> Tonya Petrece Ray gave birth to twins on December 19, 1997. Even though she was married to William Martin Ray at the time, the children's undisputed biological father was Stephen Eric Staggs with whom Ms. Ray had had a romantic tryst in early 1997. Mr. Staggs intervened in the Rays' 1999 divorce proceeding to formally establish his parentage of the twins and to obtain custody. The Rays vigorously opposed Mr. Staggs's request for custody.
>
> Following a bench trial, the trial court concluded that Ms. Ray was unfit to have custody of her children. The court then awarded custody of the twins to Mr. Ray because he was comparatively more fit than Mr. Staggs. After Mr. Staggs's lawyer pointed out that the trial court had used the wrong custody standard, the trial court entered another order concluding "by very clear and convincing proof that there is a substantial risk and danger of great harm to these children if placed with the natural parents." Notwithstanding this finding, the trial court granted Mr. Staggs weekly supervised visitation and extended unsupervised visitation during the summer of 2000 and apparently the summer of 2001.
>
> Mr. Staggs appealed the trial court's custody decision to this court. On October 5, 2001, we issued an opinion vacating the custody orders. We concluded, in part, that:
>
> > The evidence presented at the December 1999 hearing regarding Mr. Staggs does not clearly and convincingly depict a person who would be an unfit parent. By the time of the hearing, Mr. Staggs had held a well-paying job for over eighteen months and had earned the trust and respect of his employer. He [was] also married to a woman he had been dating for approximately eighteen months, and he had been fully integrated into her family. He had earned the admiration and respect of his wife's parents for his honesty and tenacity. He had also gained experience with young children and was serving as a volunteer coach for a YMCA youth basketball program. In light of this evidence, we find that the trial court placed undue weight on Mr. Staggs's past conduct rather than

on his current fitness to have custody of his children. [***Ray v. Ray***, 83 S.W.3d 726, 737 (Tenn. Ct. App. 2001).]

Based on this conclusion, we vacated the portions of the January 12, 2000 and April 3, 2000 orders denying Mr. Staggs's petition for custody of the twins and

> remand[ed] the case to the trial court with directions to conduct a hearing consistent with this opinion to determine whether Mr. Staggs is currently fit to have custody of his children and whether granting Mr. Staggs custody will expose his children to substantial harm. Pending this hearing, the trial court shall prescribe appropriate visitation for Mr. Staggs and his children. [***Id***. at 738.]

Mr. Ray filed a Tenn. R. App. P. 11 application for permission to appeal on November 30, 2001, which has not yet been acted on by the Tennessee Supreme Court.

On April 29, 2002, Mr. Staggs filed a motion requesting extended summer visitation during 2002 on essentially the same terms as his unsupervised visitation during the summers of 2000 and 2001. The trial court heard argument on this motion on May 31, 2002. According to an uncontradicted account of the May 31, 2002 proceeding filed with this court by Mr. Staggs:

> 2. Judge Soloman stated that according to the Appellate Court opinion, she felt that she could not give Mr. Moore [Staggs] an extended visitation because she felt that Mr. Moore was a dangerous person, that the minor twin children would be exposed to substantial risk of harm, that Mr. Moore was a bad person, and that she thought the Court of Appeals felt that Mr. Moore was an unfit parent and that according to their opinion, Judge Soloman did not go far enough in her order. Judge Soloman acknowledged that she had allowed the extended summer visitation for the previous two years, but she stated that she felt the Appellate Court, in their opinion, did not want her to allow any unsupervised visitation because Mr. Moore was a dangerous person. Judge Soloman stated that

she was having [a] difficult time interpreting the Court of Appeals [sic] opinion and that she kept a copy of the decision near her all the time. John M.L. Brown, attorney for Mr. Ray, stated that in last year's agreed order allowing Mr. Moore to have an extended summer visitation with the minor children, Mr. Ray stated that he reluctantly agreed to allow the minor children to go with Mr. Moore. Mr. Brown stated that Mr. Ray was opposed to Mr. Moore having any summer or holiday visitation with the minor children.

3. Mr. Moore's counsel asked that he be able to see the children on Father's Day for an extended visitation and Judge Soloman asked Mr. Ray what he had planned to do with the children for Father's Day. Mr. Ray stated that he was going to spend the day with them, then he further stated that he was going to take them out of town. Judge Soloman then stated that the children would also be able to see Mr. Ray's father, and then offered to allow Mr. Moore to spend one hour of supervised visitation with the children at McDonald's for dinner on Father's Day. Mr. Moore declined. Judge Soloman stated that Mr. Ray was the minor children's father, and that Mr. Moore was their natural father. Mr. Shaw objected to that terminology.

*****************************************

5. Judge Soloman *sua sponte* indicated that Mr. Moore could not have an extended visitation with the minor twin children until he underwent a psychological evaluation and the minor children underwent a psychological evaluation determining what harm, if any, it would cause the children. She suggested Ray Potts and *sua sponte* ordered Mr. Ray to make an appointment for the children. Mr. Shaw asked the Court to set a time limit and Judge Soloman refused but she did set another court date for July 19, 2002. Judge Soloman stated she would take the issues under advisement until the evaluations had been completed.

On June 19, 2002, Mr. Staggs filed a petition to hold Mr. Ray in contempt for refusing to permit his regular Sunday visitation on June 16, 2002. The trial court summarily declined to order Mr. Ray to show cause and dismissed the petition. On June 27, 2002, the court filed an order directing Mr. Ray to "take the subject children immediately for a thorough psychological evaluation" and ordering Mr. Staggs to "make an appointment and ... submit himself to a full and complete psychological evaluation" once the children have been evaluated. The trial court also suspended all of Mr. Staggs's visitation "pending the outcome [of] the psychological evaluations prescribed above" and set the matter "for review" on July 19, 2002.

Mr. Staggs filed an application for extraordinary appeal with this court on July 1, 2002, along with a motion for stay of the order suspending visitation and to remove the trial judge from the case on the ground of bias. In response to this court's order, Mr. Ray filed a response to Mr. Staggs's application and motions on July 8, 2002. While he did not take issue with Mr. Staggs's account of the May 31, 2002 proceedings, Mr. Ray asserts that an extraordinary appeal is unnecessary because the "trial court has done nothing more than show concern for the welfare of the subject children."

*Ray*, 2002 WL 1466095 at *1-3.

In ruling upon Mr. Moore's extraordinary appeal of the trial court's June 27, 2002 order, the court stated:

The trial court's June 27, 2002 order represents a clear departure from the accepted and usual course of judicial proceedings for three reasons. First, it is based on a palpable misinterpretation of our October 5, 2001 opinion. Nothing in this opinion concludes, or even intimates, that Mr. Staggs is an "unfit person," that the trial court did not "go far enough" in its original order denying Mr. Staggs's request for custody, or that this court "did not want ... [the trial court] to allow any unsupervised visitation because ... [he] was a dangerous person." To the contrary, we held that the evidence "does not clearly and convincingly depict a person who would be an unfit parent" and that the trial court's reasons for denying Mr. Staggs custody of his children "placed undue weight on Mr. Staggs's past conduct rather than on his current fitness to have custody of his children." Accordingly, we vacated the denial of Mr. Staggs's custody request and remanded the case with instructions to conduct a hearing into Mr. Staggs's current fitness to have custody of his children.

-5-

Pending this hearing, we succinctly directed the trial court to "prescribe appropriate visitation for Mr. Staggs and his children."

The second defect in the reasoning in the June 27, 2002 order is that it is not based on any material evidence regarding Mr. Staggs's current fitness to exercise unsupervised visitation with his children....

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

The third defect in the June 27, 2002 order is the trial court's decision, apparently on its own initiative, to require that Mr. Staggs and the twins be subjected to psychological evaluations.[1] While Tenn. R. Evid. 706 permits a trial court to appoint expert witnesses, these appointments should not be made without some factual predicate for the necessity of such an unusual step. The factual predicate for requiring parents and children to submit to psychological examinations under Tenn. R. Civ. P. 35 is discussed at some length in *Odom v. Odom*, No. M1999-02811-COA-R3-CV, 2001 WL 1543476, at \*4-9 (Tenn. Ct. App. Dec. 5, 2001), *pet. reh'g denied*, (Tenn. Ct. App. Jan. 8, 2002) (No Tenn. R. App. P. application filed). The record indicates that the trial court lacked a factual basis for ordering that Mr. Staggs and the children undergo psychological evaluations.

Accordingly, we vacate the June 27, 2002 order and remand the case for further proceedings consistent with this opinion and this court's October 5, 2001 opinion. At the hearing currently scheduled for July 19, 2002, the trial court is directed to provide the parties an opportunity to present evidence both in favor of and in opposition to Mr. Staggs's request for extended summer visitation and to make a decision regarding this request for visitation based on the evidence. At this juncture, we deny Mr. Staggs's request to remove the trial judge from this case because errors in reasoning and failure to follow established procedures do not necessarily indicate bias, either in favor of or against a particular party.

*Id*. at \*4-5.

---

[1] The trial court's order includes the judge's handwritten note that Mr. Moore agreed in open court to "submit himself to a full and complete psychological evaluation." The record on appeal includes a second order, filed July 12, 2002, directing Mr. Moore "to meet with Dr. Margaret Smith on July 17, 2002 at 2:00 p.m. for a psychological evaluation." The trial court subsequently vacated its July 12, 2002 order after considering this Court's opinion in *Ray v. Ray*, No. M2002-01553-COA-R10-CV, 2002 WL 1466095 (Tenn. Ct. App. July 9, 2002).

A hearing was held on July 19, 2002, during which the trial court was primarily concerned with identifying a suitable evaluator to conduct psychological examinations of Mr. Moore and the children. By order entered August 7, 2002, the trial court set forth the following pertinent findings from the hearing:

> [Mr. Moore] will have extended visitation with [the twins] from 6:00 p.m. on August 9, 2002, [until] 6:00 p.m. on August 18, 2002.
>
> **************************************************
>
> The parties have agreed in open court that psychological evaluations are appropriate. Tonya Petrece Ray, William Martin Ray, and Stephen Eric Staggs (Moore) will therefore participate in psychological evaluations, including evaluations of parenting skills and propensity to abuse. [Mr. Holland] and Emily Moore [("Mrs. Moore")] may submit to such evaluations if they wish to do so. Such evaluations will be performed by Dr. Victor Pestrak who will determine whether the twins need to be evaluated and, if so, by whom.

On August 21, 2002, Mr. Moore filed a motion for the assessment of court costs. Shortly thereafter, Mr. Ray filed a motion seeking execution of the unpaid balance owed by Mr. Moore on the child support arrearage judgment of $7,906.00, and of the court's January 2000 judgment directing Mr. Moore to pay to Mr. Ray $585.00, representing the cost of parentage testing. Mr. Ray's motion further sought a judgment against Mr. Moore "in the amount of $1,500.00, representing the attorney fees awarded in the order of January 12, 2000 [which was never] reduced to judgment."

Mr. Moore next filed a motion for "additional, appropriate visitation" with the twins in accordance with this Court's October 5, 2001 and July 9, 2002 opinions. The motion further stated that Mr. Moore had arranged for an appointment with Dr. Pestrak to undergo psychological evaluation. On September 5, 2002, Mr. Moore filed a motion asking the court to "vacate its order requiring him to submit to psychological testing and to order the transfer of custody of [the twins] to their father, Eric Moore, as indicated by the opinions, orders, and directives of the Tennessee Court of Appeals."

A hearing was held on September 13, 2002 to discuss court costs, execution on prior judgments in favor of Mr. Ray, and Mr. Moore's request for additional visitation. No testimony or substantive evidence was introduced regarding the issue of whether Mr. Moore was currently fit to act as the custodial parent for the twins or whether granting custody to Mr. Moore would pose a risk of substantial harm to the twins. On September 26, 2002, the trial court filed an order setting forth the following findings from the September 13, 2002 hearing:

(1) Mr. [Moore] will have supervised visitation with the twins every other weekend from 6:00 p.m. on Friday [until] 11 a.m. on Saturday....

(2) Assessment of court costs incurred after January 12, 2000, will be held in abeyance until the final hearing of this cause. In no event, however, will Mr. [Moore] be required to pay for costs incurred by Mr. and Mrs. Ray in their orders of protection that were litigated at the commencement of this case.

(3) The court has been tasked by the Court of Appeals to determine whether the twins would be substantially harmed by a transfer of custody from Mr. Ray to Mr. [Moore]. In order to do this, the trial court desires that Mr. [Moore] and the children submit to psychological evaluations to ensure that no substantial harm results to the children as a result of such transfer. Mr. [Moore] will therefore submit to a psychological evaluation, as previously ordered by the court and agreed to by him. Such evaluation will be performed by previous order. The children will be evaluated by Dr. James Walker, Vanderbilt [("Dr. Walker")].

(4) The issue of whether Mr. Ray is entitled to execute on the arrearage judgment heretofore awarded in his favor and against Mr. [Moore] in this cause is reserved for the final hearing.

(5) Mr. Ray is entitled to execute on the judgment for $585.00 awarded to him and against Mr. [Moore] in the final decree of this cause. Interest may be calculated from January 12, 2000.

(6) In [paragraph] 9 of the final decree in this cause, Mr. [Moore] was ordered to pay Mr. Ray an attorney's fee of $1,500.00, but that award was not reduced to judgment. Mr. Ray is therefore awarded a judgment against Mr. [Moore] in the amount of $1,500.00, with pre-judgment interest from January 12, 2000.

On October 17, 2002, Mr. Moore filed several motions seeking, *inter alia*, the assessment of court costs accrued after the trial court's January 12, 2000 ruling, attorney's fees, and payment of fees incurred for the psychological evaluations of Mr. Moore and his children.

Another hearing was held on November 7, 2002, at which the psychological reports completed with regard to the twins and Mr. Moore were admitted into evidence. The court questioned Mr. Moore regarding his current wife's ability to control her behavior despite an earlier violent confrontation with Mr. Ray outside of the courtroom, and the twins' relationship with their

stepmother. The court also questioned Mrs. Holland about her current employment status and future career aspirations, her new husband, and the specifics of her current residence. The court's order, entered November 22, 2002, stated in pertinent part:

> This cause came to be heard on the 7th day of November, 2002, before the Honorable Carol Soloman, for the determination of custody and visitation issues as directed by the Court of Appeals. The Court is impressed with Dr. James Walker, Ph.D., and found his report to be very helpful and valuable.
>
> Based on Dr. Walker's suggestion of a gradual transition, the Court finds it to be in the children's best interest, after the acquiescence of Mr. Ray to the change of visitation and to the custody of Mr. Moore as follows:
>
> Mr. Moore shall have custody of the two (2) minor twin children....
>
> \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
>
> During the week of February 10, 2003, Mr. Moore will take the children to Dr. Walker for further counseling and/or examination, and request a report to be filed under seal with this Court by February 20, 2003, prior to the review on February 21, 2003.
>
> None of the parties, nor their mates, shall do anything to compromise the good mental health and peaceful transition of these babies. If they do, it will indicate serious problems to this Court. The step-mother, Mrs. Moore, shall not administer corporal punishment.
>
> \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
>
> Further, the twins last name shall remain Ray as their two (2) slightly older siblings whom they have resided with their entire life.
>
> The child support, cost and attorney's fees shall be addressed in a subsequent order....

(emphasis in original).

The trial court's order further set forth a temporary schedule of visitation for Mrs. Holland and Mr. Ray so as to ease the twins' transition into Mr. Moore's custody.

On December 20, 2002, the trial court filed an amended order of custody and visitation, specifically denying Mr. Moore's request for attorney's fees on grounds that Mr. Moore was "the interloper in this marriage" and that "[h]is hands are colored with the shame of impregnating a [married woman]." The court's order included the following additional amendments:

> Further, the support paid by Ms. [Holland] to Mr. Ray shall go to Mr. Moore immediately. There has not been a request for any other support. Mr. [Moore] owes to Mr. Ray a large judgment for child support that he has willfully failed to pay. Mr. Ray shall deduct $50.00 per month from the arrearage judgment beginning January 1, 2003, for child support for his stepchildren as long as his visitation [of] at least 2 days a month is exercised. Also, $50.00 per month shall be deducted from the judgment until further notice. However, the judgment may be executed upon any remaining sums plus interest with notice to Mr. [Moore's] attorney.

> \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

> Further, the twins' last name shall remain Ray, the same as their two (2) slightly older siblings, with whom they have resided their entire lives. Although the children are still of young age, their brother and sister are the only stable things in their lives outside of their former father. This Court envisions a traumatic effect upon the children undergoing so many startling changes, that the name change could potentially adversely affect the children. The children's mother was named "Ray." There is no embarrassment with this name, but to take a name of a man not related to the children, to wit the father of the wife Mr. [Moore] seems absurd at best. Mr. [Moore] was not born with the name of Moore, but chose it within the last year. He now wants these children to follow suit. There is no stability of respect in taking anyone's name who is in the children's lives with no history of longevity in the name chosen by Mr. [Moore]. Again, Mr. [Moore's] name has only been Moore for a very short time. From Mr. [Moore's] jump from one relationship to another this Court is not comfortable in making the children change their name with Mr. Staggs-Moore.

> Further, all cost [sic] accrued from January 21, 2000, to the entering of this order shall be paid 2/3 by [Mr. Moore], 1/3 to William Ray due to the majority of the costs arising from the numerous Interlocutory Appeals rather than from one appeal of the final order, for which execution may issue if necessary.

(emphasis in original).

The trial court filed a second amended order of custody and visitation on December 30, 2002, deleting the statements and reasons offered in support of its decision to keep the twins' last name as "Ray." The court edited its finding to state only that the twins' last name should remain "Ray" so as to reinforce or maintain the children's connection with their two older siblings of the same last name, and with whom they had lived their entire lives.

A final hearing was held on February 21, 2003, whereat Mr. Moore elected to proceed *pro se* due to his counsel's unavoidable absence and despite the trial court's offer to allow him to continue the proceedings until such time as counsel would become available. At the hearing, the trial court refused to reveal the content of Dr. Walker's follow-up evaluation of the twins, to which none of the parties objected, and chose only to disclose Dr. Walker's finding that the twins were in need of further counseling. The court moreover considered, *inter alia*, the specific issues of Mrs. Holland's parental fitness for the purpose of awarding or granting standard visitation with the twins, and her child support obligations.

The court heard testimony from Mrs. Holland's current husband, William Ray Holland ("Mr. Holland"), concerning the twins' alleged contact with a purportedly abusive relative, and the general care that he and Mrs. Holland provide and/or are willing to provide for the children. Ms. Annette Christine Kaiser ("Ms. Kaiser"), a co-worker and friend of Mrs. Holland, testified that Mrs. Holland maintains a comfortable home with adequate room for the twins and other children, and further noted that the children appear to have a good relationship with both Mrs. and Mr. Holland. Ms. Kaiser stated that, to her knowledge, there were no conditions or individuals present in Mrs. Holland's home that would pose a threat of harm to the twins.

Mrs. Holland testified that she had been exercising her visitation rights with the twins and averred that she was no longer an unfit parent and was therefore entitled to standard visitation with the children. Mrs. Holland discussed several changed circumstances in her life, including her marriage to Mr. Holland, a recent history of steady and gainful employment, a renewed interest in education and career, and a proven ability to maintain a safe and stable home environment.

In an order filed April 25, 2003, the trial court set forth its findings from the February 21, 2003 hearing, stating:

> The court considered the statements of counsel, testimony of the parties and their witnesses; the report of James Walker, Ph.D., and the entire record in this cause, from all of which the court finds and **ORDERS** as follows:
>
> (1) Dr. Walker's report was delivered to the court under seal, and it will remain under seal. Neither the parties nor their counsel

-11-

may read the report without first having obtained an order from the court.

(2) The aforementioned report suggests that the two children who are the subject of this litigation ("the twins") are in some emotional stress, and Dr. Walker recommends the assistance of a child psychiatrist or psychologist to help alleviate the stress. Mr. Moore will therefore make arrangements to take the children for counseling with possibly Dr. Cathy Griffin, with the latter to determine the duration and intensity of the counseling. The adult parties to this case will make themselves available to attend such counseling if requested to do so by the counselor. Costs of such counseling that are not covered by insurance will be divided equally by Mr. Moore and Ms. Holland.

(3) Ms. Holland has a duty to pay child support for four children, *viz*, the twins, and the two older children of Mr. Ray and Ms. Holland. The court has previously determined that guidelines support for four children, based on Ms. Holland's income, is $622.00 a month. Beginning in March 2003, and continuing in each calender month thereafter, Ms. Holland will pay $311.00 to Mr. Moore for the support of the twins, and she will pay $311.00 to Mr. Ray for the support of the two older children....

(4) Mr. Moore's duty to pay child support, as previously ordered, is terminated as of November 30, 2002.

(5) From the evidence adduced at the hearing, the court finds that Ms. Holland is no longer an unfit parent. She has remarried and is gainfully employed, and she gives every indication that she is taking her parenting duties seriously.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

(7) Neither Ms. Holland's husband or Mr. Moore's wife will administer corporal punishment to the twins. All of the parties and all persons in active concert and participation with them are enjoined from speaking derogatorily about each other in the presence of any of the children.

(8) Following the twins' birth, Mr. Ray believed himself to be their natural father. In fact, as was later determined, he was their

stepfather by virtue of his marriage to Ms. Holland who was then his wife.

(9) T.C.A. § 36-6-303 provides, in pertinent part, that a stepparent "...may be granted reasonable visitation rights ... upon a finding that such visitation rights would be in the best interests of the minor child[ren] and that such stepparent is actually providing or contributing towards the support of such child[ren]."

(10) The court specifically finds that the best interests of the twins would be served by permitting Mr. Ray to have certain visitation rights with them.

(11) Mr. Ray has evidenced a willingness to provide or contribute toward the support of the twins. He is therefore ordered to pay the sum of $50.00 a month as his contribution towards the support of the twins.

(12) Rather than pay the aforementioned $50.00 a month directly to Mr. Moore, [Mr. Ray] will deduct $50.00 a month from the judgment previously awarded to him and against Mr. Moore for unpaid child support. For so long as Mr. Ray continues to apply such monthly credits against the judgment, he will not seek to issue execution or otherwise attempt to collect the unpaid balance owed on the judgment. Should he later determine that he wishes to collect the balance owed on the judgment, he will take no action without having first given Mr. Moore at least 30 days' notice of his intent to institute collection procedures.

(13) The phrase "weekend visitation," as used in this order, means 6:00 p.m. on Friday, until 6:00 p.m. on Sunday.

(14) Ms. Holland will have weekend visitation with the twins on every other weekend, commensurate with her weekend visits with the two older children.

(15) Mr. Ray will have one weekend visit with the twins every month on the first weekend of each calender month when the older children are with him. His first such visit will be on February 28 - March 2, 2003, and visitation in succeeding months will begin on the first Friday of each calender month when he is going to have the older children on that weekend.

(16) Mr. Ray may telephone the twins at Mr. Moore's residence, provided that his calls are reasonable as to frequency, time, and duration. Mr. Ray and Ms. Holland may make occasional visits to the twins' daycare or school, in order to have lunch with the twins. They will do this infrequently so as not to disrupt the twins' school activities. Mr. Moore will advise daycares and schools of the court's order in this regard.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

(18) Mr. Ray will have visitation with [the] twins from 6:00 p.m. on December 26 until 6:00 p.m. on December 28 every year.

(19) The twins' summer residential schedule will be as follows:

(a) The twins will be with Mr. Ray for an uninterrupted week beginning at 6:00 p.m. on the Friday next following the end of the school year.

(b) At the conclusion of Mr. Ray's week, Ms. Holland will have the twins for four weeks, ending at 6:00 p.m. on the fourth Friday following the end of Mr. Ray's visit.

(c) During the four weeks when the twins are to be with Ms. Holland, Mr. Moore will have a weekend visit at the end of the first week and at the end of the third week.

(d) At the conclusion of Ms. Holland's four-week extended visit, the twins will be with Mr. Ray for an additional week.

(e) At the conclusion of Mr. Ray's additional week, Mr. Moore will have the twins for the remainder of the summer vacation, except that Ms. Holland will have weekend visitation at the end of Mr. Moore's second week.

(f) Standard visitation, as prescribed elsewhere in this order, will begin once [the] school year begins.

(g) Mr. Ray's monthly weekend visits will recommence in September.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

(21) Court costs accruing since December 30, 2002, will be divided equally between Mr. Moore and Ms. Holland.

Mr. Moore filed a timely notice of appeal of the trial court's April 25, 2003 order, and presents eleven issues for review, which we restate as follows:

1. Whether the trial court committed reversible error in awarding visitation to Mr. Ray, a non-related, third party, absent a finding "that denial of such visitation presented a risk of substantial harm to the children.

2. Whether the trial court committed reversible error in finding, *sua sponte*, that Mrs. Holland was a fit parent, "without pleadings or [an] evidentiary hearing" to support the finding.

3. Whether the trial court erred in refusing to change the twins' surname from "Ray" to "Moore."

4. Whether the trial court erred in its division of court costs.

5. Whether the trial court erred in denying Mr. Moore's request for attorney's fees for litigation in this matter.

6. Whether the trial court erred in restraining or prohibiting Mrs. Moore from administering corporal punishment to the twins.

7. Whether the trial court's finding that Mr. Moore failed to timely pay child support arrearages "was not supported by the evidence and should be stricken [from the record] along with the [court's] order allowing execution with 30 days notice."

8. Whether the trial court erred in using or relying upon Dr. Walker's sealed report in rendering its opinion.

9. Whether the trial court erred in ordering Mr. Moore to obtain psychological counseling for the twins.

10. Whether the trial court committed reversible error by using incorrect income figures to calculate Mrs. Holland's monthly child support obligations to Mr. Moore.

11. "Whether Mr. Moore is entitled to attorney's fees from his appeal in this matter."

Since this case was tried by the court sitting without a jury, we review the case *de novo* upon the record with a presumption of correctness of the findings of fact by the trial court. Unless the evidence preponderates against the findings, we must affirm, absent error of law. *See* Tenn. R. App. P. 13(d).

## I.

The first issue presented for review is whether the trial court erred in awarding visitation to Mr. Ray. Tennessee Code Annotated § 36-6-303 (1996) states:

> **Visitation rights of stepparents.** – (a) In a suit for annulment, divorce or separate maintenance where one (1) party is a stepparent to a minor child born to the other party, such stepparent may be granted reasonable visitation rights to such child during its minority by the court of competent jurisdiction upon a finding that such visitation rights would be in the best interests of the minor child and that such stepparent is actually providing or contributing towards the support of such child.
>
> (b) Such decree shall remain within the control of the court and be subject to such changes or modification as the exigencies of the case require.

The trial court's final order set forth the following pertinent findings:

> (10) The court specifically finds that the best interests of the twins would be served by permitting Mr. Ray to have certain visitation rights with them.
>
> (11) Mr. Ray has evidenced a willingness to provide or contribute toward the support of the twins. He is therefore ordered to pay the sum of $50.00 a month as his contribution towards the support of the twins.

It is apparent from the above-quoted excerpt that the trial court made the proper findings required under T.C.A. § 36-6-303(a). We note, initially, that the evidence in the record does not preponderate against the trial court's finding that visitation with Mr. Ray was in the twins' best interests. The record on appeal is sparse with regard to substantive evidence, and does not include any transcripts from hearings conducted prior to July 19, 2002. The court's final order of April 25, 2003, states that the court "considered the statements of counsel, testimony of the parties and their witnesses; the report of Dr. James Walker, Ph.D., and the entire record in this cause" in rendering its decision. In *Coakley v. Daniels*, 840 S.W.2d 367 (Tenn. Ct. App. 1992), this Court noted:

> Where the issues raised go to the evidence, there must be a transcript. In the absence of a transcript of the evidence, there is a conclusive

-16-

presumption that there was sufficient evidence before the trial court to support its judgment, and this Court must therefore affirm the judgment. *McKinney v. Educator and Executive Insurers, Inc.*, 569 S.W.2d 829, 832 (Tenn. Ct. App. 1977). This rule likewise applies where there is a statement of the evidence which is incomplete. The burden is upon the appellant to show that the evidence preponderates against the judgment of the trial court. *Capital City Bank v. Baker*, 59 Tenn. App. 477, 493, 442 S.W.2d 259, 266 (1969). The burden is likewise on the appellant to provide the Court with a transcript of the evidence or a statement of the evidence from which this Court can determine if the evidence does preponderate for or against the findings of the trial court.

*Id*. at 370. *See also Scarbrough v. Scarbrough*, 752 S.W.2d 94, 97 (Tenn. Ct. App. 1988) ("When the trial court hears the evidence, but the evidence is not included in the record on appeal, it is presumed that the evidence supports the ruling of the trial court."). We thus presume that the evidence presented to the court in the hearings prior to July 19, 2002, which the court relied upon in initially designating Mr. Ray as the custodial parent for the twins, supports the ruling of the court that visitation with Mr. Ray is in the best interests of the twins.

With regard to Mr. Ray's present support of the twins, we reiterate that Mr. Ray was the custodial parent for the twins at the time of the court's final ruling, or immediately prior thereto, and thus we logically conclude that he was "providing or contributing towards the support" of the children. For these reasons, we find that the trial court did not err in awarding Mr. Ray visitation with the twins.

We note, moreover, that Mrs. Holland did not and does not oppose the trial court's award granting Mr. Ray visitation with the twins. Mrs. Holland did not brief the issue of step-parent visitation on appeal, but rather "defer[red] to Mr. Ray's argument in this regard." Mrs. Holland's decision to withhold opposition to the trial court's visitation award, and her deferral to Mr. Ray's argument, can logically be construed or interpreted as her belief that visitation with Mr. Ray is in the children's best interests.

Mr. Moore argues that the trial court erred in awarding Mr. Ray visitation with the twins where the trial court made no finding that denial of such visitation would present a risk of substantial harm to the children. In support of his argument, Mr. Moore relies specifically upon the case of *Engel v. Young*, No. M2001-00734-COA-R3-CV, 2003 WL 1129451 (Tenn. Ct. App. Mar. 14, 2003), wherein the trial court granted visitation to the adult half-siblings of a minor child. The minor child's natural mother appealed the trial court's decision, and the Middle Section of this Court reversed the trial court's ruling as to third party visitation, stating:

In *Hawk v. Hawk*, 855 S.W.2d 573 (Tenn. 1993), the Tennessee Supreme Court held that Article I, Section 8 of the

Tennessee Constitution protects the privacy interests of parents in their child-rearing decisions, as long as those parental decisions do not substantially endanger the welfare of their children. "Absent some harm to the child, we find that the state lacks a sufficiently compelling justification for interfering with this fundamental right." *Hawk*, 855 S.W.2d at 582.

Among those child-rearing decisions left to parents is the right to decide with whom a child associates and with whom the child may be responsibly left for brief periods of time. In *Hawk*, for example, the issue involved visitation with grandparents, and the Supreme Court held that courts could not award visitation to grandparents over the objection of the parents in the absence of a finding that the failure to award such visitation would result in substantial harm to the child. Where a court order has given primary or sole legal custody to one parent, the right to make child-rearing decisions rests with the custodial parent. *Rust v. Rust*, 864 S.W.2d 52 (Tenn. Ct. App. 1993).

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

In summary,

A court may not award a non-parent visitation unless the non-parent can show that denial of visitation presented a risk of substantial harm to the child. *See Simmons v. Simmons*, 900 S.W.2d 682, 685 (Tenn. 1995). If an order granting visitation does not include a finding on the issue of substantial harm, that order is invalid. *See In re Askew*, 993 S.W.2d 1, 4 (Tenn. 1999).

*Williams v. Thrailkill*, No. W1999-01032-COA-R3-CV, 2000 Tenn. App. LEXIS 718, at \*11 (Tenn. Ct. App. Oct. 23, 2000) (no Tenn. R. App. P. 11 application filed).

*Id*. at \*4-5.

We do not find *Engel* to be controlling under the particular facts of this case. First, we note that T.C.A. § 36-6-303 does not require the court to make a finding of substantial harm in support of a stepparent visitation award. The plain language of the statute requires a court to find (1) that visitation with a stepparent is in the best interests of the children, and (2) that the stepparent is making contributions to the support of the children. As discussed, both of these factors are present

in the case at bar.  Moreover, *Engel* involves a grant of visitation to half-siblings who never acted as parents to the minor child, and never enjoyed or exercised custody over the child.[2]

The evidence in the record indicates that Mr. Ray, in his role as stepfather, raised the twins as his own for several years.  Mr. Ray has remained a steady, positive, and loving parental figure in the lives of two young children who have already suffered more than their fair share of disruption, uncertainty, and instability.  We therefore affirm the trial court's ruling granting Mr. Ray visitation with the twins.  Mr. Moore's issue is without merit.

## II.

Mr. Moore next presents for review the issue of whether the trial court "committed reversible error in declaring [Mrs. Holland] a fit parent without pleadings or an evidentiary hearing."  We quote Mr. Moore's argument in support of his issue in its entirety:

> "It is a fundamental rule of law that in order to receive relief, a party must plead it, request it, and prove it in court with the opposing party having the opportunity to offer proof opposing the items requested." *Lewis v. Lewis*, No. 89-287-II, 1990 WL 14022, at *3 (Tenn. Ct. App. Feb. 16, 1990) (no Tenn. R. App. P. 11 application filed). [*See also*] *West v. West*, No. M1998-00725-COA-R3-CV, 2000 WL 64268, at *3 (Tenn. Ct. App. Jan. 27, 2000).   The *Lewis* Court continues:
>
> > A Court of Chancery has no jurisdiction of any matter not submitted to it in a pleading for adjudication; nor can the defendant be called on to respond to anything not alleged against him.  Neither can a Court consider any evidence which does not directly, or indirectly, tend to prove or disprove the allegations contained in the pleadings. A decree can neither be based on allegations without corresponding proof, nor on proof without corresponding allegations. All decrees must be the concurring result of allegations justified by proof, and proof justified by allegations.  A decree based on pleadings without proof, will be reversed on appeal, but will be good against collateral attack.  A decree based on proof,

---

[2] In *Williams*, the case relied upon by the *Engel* court as the basis for its summary judgment, this Court vacated a judgment of the trial court granting visitation rights to the minor child's aunt.  *Williams*, 2000 WL 33191365 at *4.

without pleadings, will not only be reversed on appeal, but will also yield to a collateral attack because such a decree is *coram non judice*, and absolutely void. The jurisdiction of the Court is circumscribed by the pleadings, and the pleadings are circumscribed by the Law.

This fundamental rule of law has been upheld by the courts of Tennessee. The Supreme Court dealt with this issue in *Fidelity-Phenix Fire Ins. Co. of New York v. Jackson*, 181 S.W.2d 625 (Tenn. 1944), citing a catalogue of Tennessee cases following this rule and quoting 15 R.C.L., at p. 604:

> [A] judgment will be void which is a departure from the pleadings, and based upon a case not averred therein, since if allowed to stand it would be *altogether arbitrary and unjust and conclude a point upon which the parties had not been heard .... Therefore the rule is firmly established that irrespective of what may be proved a court cannot decree to any plaintiff more than he claims in his bill or other pleadings*. (emphasis added) 181 S.W.2d 625 at 629.

[*Id*.] at *4.

In the case at bar the children's mother did not "... plead it, request it, or prove it in court with the opposing party having the opportunity to offer proof opposing..." as to her present fitness as a parent. The Trial Court merely found *sua sponte* without proof that the children's natural mother was a fit parent. Thus, the decree is based on proof, without pleadings and must be reversed on appeal. It is also subject to collateral attack because it is *coram non judice*, and absolutely void.

In the instant matter, Mrs. Holland's parental fitness is relevant only to the question of whether she is entitled to standard visitation with the twins. However, Mr. Moore fails to specifically appeal the trial court's grant of standard or traditional visitation to Mrs. Holland in his brief, opting, rather, to focus his argument solely on the court's alleged error in re-considering Mrs.

-20-

Holland's parental fitness. We find that an issue regarding Mrs. Holland's parental fitness is irrelevant where Mr. Moore fails to specifically challenge or appeal the trial court's award of visitation to the mother. This court is not required to consider issues not properly before it, nor are we charged with the duty of interpreting or deciphering an issue to the point of relevancy. We therefore find Mr. Moore's issue without merit.

### III.

Mr. Moore's third issue for review is whether the trial court committed reversible error in refusing to legally change the twins' surname from "Ray" to "Moore."

In *Barabas v. Rogers*, 868 S.W.2d 283 (Tenn. Ct. App. 1993), the Middle Section of this Court stated:

> Parties seeking to change a child's surname bear the burden of showing good cause for the change.
>
> \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
>
> ***The courts should not change a child's surname unless the change promotes the child's best interests***. *Halloran v. Kostka*, 778 S.W.2d 454, 456 (Tenn. Ct. App. 1988); *see also In re Marriage of Schiffman*, 169 Cal.Rptr. 918, 921, 620 P.2d 579, 582 (1980); *In re Cardinal*, 611 A.2d [515, 517 (Del. Fam. Ct. 1991)]; Kristine C. Karnezis, Annotation, *Rights and Remedies of Parents Inter Se With Respect to the Name of Their Children*, 92 A.L.R.3d 66 § 8.5 (Supp. 1992). Among the criteria for determining whether changing a child's surname will be in the child's best interests are: (1) the child's preference, (2) the change's potential effect on the child's relationship with each parent (3) the length of time the child has had its present surname, (4) the degree of community respect associated with the present and proposed surname, and (5) the difficulty, harassment, or embarrassment that the child may experience from bearing either its present or its proposed surname. *In re Saxton*, 309 N.W.2d 298, 301 (Minn. 1981); *Bobo v. Jewell*, [38 Ohio St. 3d 330, 528 N.E.2d 180, 185 (1988)]; *Daves v. Nastos*, 105 Wash.2d 24, 711 P.2d 314, 318 (1985). The parent seeking to change the child's surname has the burden of proving that the change will further the child's best interests. *In re Petition of Schidlmeier*, 344 Pa. Super. 562, 496 A.2d 1249, 1253 (1985); *In re M.L.P.*, 621 S.W.2d 430, 431 (Tex. Ct. App. 1981).

*Id*. at 285-86; 287 (emphasis added).

The record on appeal in the present case does not include a petition, motion, or formal request for a change of the twins' surname from "Ray" to "Moore." Further, the record includes only the following discussion between Mr. Moore's counsel and the trial court regarding Mr. Moore's desire to have the twins' surname changed to "Moore":

> MR. SHAW: Oh. And the children's name.
>
> THE COURT: Oh, the children's name.
>
> MR. SHAW: Obviously, Mr. Moore wants his children to be named Moore.

A brief discussion of Mr. Moore's reasons for taking his wife's maiden name ensued.

Upon our review of the record and the particular circumstances of this case, we find that it is in the best interests of the twins to change their surname from "Ray" to "Moore." We note that Mr. Moore failed in his burden to introduce sufficient evidence into the record showing good cause for the change. In fact, Mr. Moore introduced no specific substantive evidence to indicate good cause for the requested change, but rather relied solely on counsel's assertion that Mr. Moore wants the twins' surname changed in support of his argument.

Despite the lack of evidence in the record specifically pertaining to whether good cause exists to require a change of the twins' surname, our preeminent concern in this case is the best interests of the children. For the following reasons, we find that it is in the twins' best interests to change their surname to "Moore." First, Mr. Ray is not the biological father for these children, nor is he the custodial parent. Second, Mrs. Holland, no longer carries Mr. Ray's surname; thus, neither of the twins' biological parents currently have the surname "Ray." Third, Mr. Moore is the natural father and custodial parent of the twins. In light of the confusion and instability that has inexcusably wreaked havoc in the twins' young lives, we find that the children's interests would be best served by cementing or affirming their bond to their natural father and custodial parent by a change in surnames. Finally, in his brief, Mr. Ray states that he "wants what is best for the children," and concedes that "[w]hile he would like for them to continue to bear his name, ... a name change is probably appropriate under the circumstances."

To be frank, we are left with few options with regard to this issue. None of the parties involved have been a picture or model of stability. Mr. Ray, the party we find to be the most stable, is not the twins' natural father, nor is he the custodial parent. Moreover, as noted, he concedes that "a name change is probably appropriate under the circumstances." Thus, in this court's view, we are left to choose only between the current surnames of the children's biological parents. None of the parties contend that the twins' surname should be changed to "Holland," nor do we find it to be in the children's best interest to give them the surname of a mother and stepfather with whom they do not reside. Therefore, we are essentially confined to conclude that the children should carry their natural father's current surname of "Moore." Despite evidence that Mr. Moore has made a concerted

effort to clean up his act and is currently involved in a committed marital union, we are deeply concerned by his history of relationship instability and the possibility that future marital discord could cause more suffering, confusion, and upheaval in these young children's lives. We note, however, that Mr. Moore states in his brief that he and his wife "made a very thoughtful decision regarding the name they would both bear for the rest of their lives and came to the conclusion that "Moore" as [sic] the name they would choose for themselves and their children," and we find no evidence to the contrary. We are thus inclined to trust that Mr. Moore has made the decision that he believes to be in the best interests of his children.

Based upon the foregoing discussion, we find that the trial court erred in determining that the twins' surname should remain "Ray," and thereby reverse the court's April 25, 2003 order, and all previous orders, to the extent that they deny Mr. Moore's request for a change in surname.

## IV.

The fourth issue presented for review is whether the "trial court committed reversible error in the division of court costs." Mr. Moore's argument, as stated in his brief, reads in pertinent part as follows:

> Similarly, in the case at bar, Mr. Ray, as previously noted by this Court, vigorously opposed all of the Appellant's attempts in forming a relationship with his children and "... carried the battle to his wife's lover at every turn." Mr. Ray obsessively pursued these proceedings with unwarranted allegations, which significantly added to their expense and he ultimately did not carry the day. Appellant should not be burdened with a large court cost judgment from the four plus years of litigation, which was prolonged by Mr. Ray's obsessive use of the judicial system regarding custody of two children who are not his.
>
> In an Order entered January 12, 2000, the trial court stated that the court costs would be divided between [Mr. Moore] and [Mrs. Holland]. In an Order entered September 26, 2002, the trial court states, "(2) Assessment of court costs incurred after January 12, 2000, will be held in abeyance until the final hearing of this cause. In no event, however, will [Mr. Moore] be required to pay for costs incurred by [Mr. Ray and Mrs. Holland] in their orders of protection that were litigated at the commencement of this case." In another Order entered December 20, 2002, the trial court states, "Further, all cost accrued from January 21, 2000, to the entering of this order shall be paid 2/3 by Eric Staggs-Moore, [and] 1/3 to William Ray due to the majority of the costs arising from the numerous Interlocutory Appeals rather than from one appeal of the final order, for which

execution may issue if necessary." In the final Order entered April [25], 2003, the trial court states, "21. Court costs accruing since December 30, 2002, will be divided equally between Mr. Moore and Mrs. Holland."

In the case at bar, the trial court intends to punish Appellant by requiring him to pay the court costs. The trial court has grossly abused her discretion by allowing her personal feelings [sic] get in the away [sic] of the law. The trial court seems to have taken it personally that Appellant has filed numerous interlocutory appeals, but Appellant would insist that if the trial court had followed the law and stopped Mr. Ray in his ridiculous rampage, he would not have been forced to file the interlocutory appeals.

Mr. Moore's brief generally appeals the trial court's "division of court costs;" however, it is apparent that he is only challenging the trial court's division of court costs as between him and Mr. Ray for costs accrued from January 21, 2000 through December 20, 2002. Therefore, we are not concerned with the trial court's division of court costs between Mr. Moore and Mrs. Holland.

The trial court is afforded discretion in taxing and assessing costs. *Long v. Long*, 957 S.W.2d 825, 833-34 (Tenn. Ct. App. 1997). On appeal, the trial court's decision to award costs will be reversed if the trial court abused that discretion. *Id*. We find that the trial court did not abuse its discretion in its division of court costs among Mr. Moore and Mr. Ray for costs accrued from January 21, 2000 through December 20, 2002, and specifically note that there is absolutely no evidence in the record to indicate that the trial court assessed court costs against Mr. Moore as a form of punishment. Moreover, the evidence in the record does not support Mr. Moore's characterization of Mr. Ray's efforts to obtain or maintain custody of the twins' as a "ridiculous rampage." We thus find Mr. Moore's issue without merit.

## V.

Mr. Moore next presents for review the issue of whether the trial court erred in refusing to grant him an award of attorney's fees.

The trial court is vested with wide discretion in the allowance of attorney's fees, and we will not interfere except upon a showing of an abuse of this discretion. *Threadgill v. Threadgill*, 740 S.W.2d 419, 426 (Tenn. Ct. App. 1987). While we refuse to adopt the reasoning expressed by the trial court in support of its ruling, we nonetheless find that the court did not abuse its discretion in refusing to grant Mr. Moore an award of attorney's fees. All of the parties' involved in this matter are to blame for the prolonged dispute, and thus must share in the costs and expenses of litigation. Despite Mr. Moore's argument to the contrary, we find no evidence that Mr. Ray engaged in inappropriate, frivolous, or unwarranted conduct for the purpose of prolonging the dispute. Moreover, Mr. Moore's counsel's own brief, oral argument, and multiple motions for recusal appear

to suggest or explain that his tumultuous relationship with the trial court hindered timely resolution of this matter.

We therefore find Mr. Moore's issue without merit.

## VI.

This Court next considers whether the trial court erred in prohibiting Mrs. Moore (stepmother) from administering corporal punishment to the twins.

Tennessee has long recognized the rights of natural parents to raise their children without interference from the state. In *Hawk v. Hawk*, 855 S.W.2d 573 (Tenn. 1993), our Supreme Court reaffirmed Tennessee's strong commitment to protecting parental rights in holding that a parent's right to raise his or her child without state interference is subject only to a showing that the parent's decisions present a risk of substantial harm to the child. In holding that parental rights are a fundamental liberty interest under Article I, Section 8 of the Tennessee Constitution, the *Hawk* Court noted that "the right to rear one's children is so firmly rooted in our culture that the United States Supreme Court has held it to be a fundamental liberty interest protected by the Fourteenth Amendment to the United States Constitution." *Id*. at 578.

As the twins' natural father, Mr. Moore has a right to determine the reasonable and no-abusive methods of discipline to be administered to his children. As the children's natural mother, Mrs. Holland is also entitled to a say as to the type and scope of reasonable discipline inflicted upon her children. In the unpublished case of *Wilson v. Wilson*, No. E2000-01374-COA-R3-CV, 2001 WL 703881 (Tenn. Ct. App. June 22, 2001), the Eastern Section of this Court considered the sole issue of whether the evidence in the record preponderated against the lower court's finding "of a material change of circumstance such that there existed a risk of substantial harm to the minor children sufficient to necessitate a change in residential custody." *Id*. at 1. The court specifically considered the stepfather's use of corporal punishment on the minor children despite the natural father's adamant objection to such discipline, finding:

> While we recognize that children should be disciplined and that step-parents should be allowed to discipline the children residing in their household, there are other means of punishing children than whipping them with a "hickory" when one of their parents has specifically stated a preference against the use of such punishment.

*Id*. at *6.

The court did not find that the stepfather's use of corporal punishment alone "r[o]se to the level of a change in circumstance such that a change in custody is required to prevent substantial harm to the minor children[;]" however, the court noted that this evidence was consistent with testimony

indicative of the mother and stepfather's poor judgment, and supported a change of custody to the natural father. *Id*. at *6-9.

It is clear from Mrs. Holland's brief that she does not wish for Mrs. Moore to administer corporal punishment to the twins. We do not find Mrs. Holland's request to be unreasonable and therefore conclude that the trial court did not err in ruling that Mrs. Moore is prohibited from using corporal punishment to discipline the twins. Our finding does not foreclose or effect Mrs. Moore's ability to discipline the children in a reasonable, non-corporal, non-abusive manner. Moreover, should Mr. Moore have a reasonable basis for asking that Mr. Holland refrain from administering corporal punishment to the twins, we find that he would be entitled to such a request.

## VII.

Mr. Moore next asks this Court to determine whether the trial court erred in finding that Mr. Moore failed to timely pay child support to Mr. Ray. Mr. Moore failed to raise this issue in either of his first two appeals despite the fact that the issue was available to him at the time of his first appeal. We are therefore unwilling to consider this issue. Moreover, we note that Mr. Moore is no longer obligated to pay Mr. Ray child support now that Mr. Moore is the custodial parent of the twins. Rather, the court determined that $50.00 would be deducted from the due and owing child support arrearages each month as support paid by Mr. Ray to Mr. Moore.

Mr. Moore's assertion or error is based solely upon his contention that the trial court incorrectly found, *sua sponte*, that he failed to timely pay child support in accordance with the court's order. Mr. Moore did not, and does not, appeal his obligation to pay child support, nor does he dispute the amount of child support owed. We deem all other concerns to be immaterial to this matter, and therefore find Mr. Moore's issue without merit.

## VIII.

Mr. Moore's eighth issue asks this court to determine whether the trial court erred in basing its final order of custody and visitation on Dr. Walker's psychological report, where said report remained under seal and was not available for review by counsel. Mr. Moore's argument is based upon three primary assertions: (1) the trial court did not have the proper factual predicate to order the twins to undergo psychological evaluation by Dr. Walker; (2) the report constitutes inadmissible hearsay not covered by any recognized exception; and (3) the trial court improperly prohibited counsel from reviewing the report prior to rendering its decision.

To briefly reiterate the pertinent procedural history, the court first ordered the twins to undergo psychological evaluation by Dr. Walker in an order entered September 26, 2002, for the apparent purpose of determining whether the children would be substantially harmed by a transfer of custody. On November 22, 2002, the trial court entered an order of custody and visitation finding, *inter alia*:

During the week of February 10, 2003, Mr. Moore will take the children to Dr. Walker for further counseling and/or examination, and request a report to be filed ***under seal*** with this Court by February 20, 2003, prior to the review on February 21, 2003.

(emphasis in original).

It is apparent that the court acted of its own volition in ordering further counseling for the children, as there was no discussion at the November 7, 2002 hearing regarding additional counseling or the fact that any report generated from such counseling would remain under seal.

At the final hearing of February 21, 2003, the trial judge made the following statements from the bench regarding Dr. Walker's sealed report:

THE COURT: Now, let me tell you all, before we get started, Dr. Walker filed with [t]he Court, under seal, a – a report. The fee for Dr. Walker is $1,475, it's to be divided three ways, so I do want to make copies of that for each of you, and we'll – we'll – that won't be under seal.

But I do not want anyone, except by court order, to read this report. I think it's important for the children to think that when they talk to a doctor that what they say is in private.

But the one thing I can disclose to you is that Dr. Walker is most concerned about the mental health of these children. He said they have some significant problems. And that he recommends that – that the family, Mr. Moore and his wife and the children, need to have professional assistance in dealing with this adjust – with this adjustment, and that the children desperately need a child psychologist or psychiatrist, he recommends.

But as I understand it, a psychiatrist could, perhaps, give them medication. Hopefully, Dear God, they're not going to need medication. What I would suggest is you all agree on a good child psychologist. And the reports are to be made to me, but under seal and no one's to see them but me.

It's – He did recommend that Mr. and Mrs. Moore develop some assistance in – need some assistance – I'm sorry – in developing positive disciplinary strategies.

I'll be glad to share this with whatever psychologist you all choose, but I don't want to share it with the parties, I don't think it helps. All I can tell you is that the children are in serious distress and that this doctor says they need psychological counseling.

And, of course, I don't think this is anything that we, as adults, did not expect. I was hoping it would not come to pass, but it did. It's going to be under seal; unless you can convince me that the attorneys need to read it, it will remain that way, unless by court order it's open.

So, I want the children to get counseling immediately.

The trial court's initial order of custody and visitation and each of the subsequent amended orders reiterated its finding that Mr. Moore was required to take the twins to Dr. Walker for additional counseling, and that the doctor's report from the counseling session should be filed under seal with the court. Mr. Moore did not file any pleading or motion objecting to any of the trial court's orders requiring the twins to undergo additional counseling with Dr. Walker and further directing that the doctor's report from the session be filed under seal with the court, nor did he enter an oral objection to the court's finding or directive at the February 21, 2003 hearing.[3] A party who invites or waives error, or who fails to take reasonable steps to cure an error, is not entitled to relief on appeal. *See* Tenn. R. App. P. 36(a), cmt. a.[4] We therefore find that Mr. Moore's issue is not properly before this Court.

In the event that this Court is deemed to have a duty to consider Mr. Moore's argument that the trial court improperly relied upon Dr. Walker's sealed report in rendering its final decision of custody and visitation, we find his issue to be without merit. We note, initially, that the trial court aptly summarized the contents of Dr. Walker's report to the parties at the February 21, 2003 hearing. Further, we have examined Dr. Walker's sealed report and find nothing in his evaluation to contradict the court's findings with regard to visitation, custody, and continued counseling. We therefore find the court's failure or refusal to permit counsel access to or review of Dr. Walker's report to be harmless error.

---

[3] Mr. Moore voluntarily proceeded *pro se* at the February 21, 2003 hearing despite the trial court's offer to allow a continuance. Although *pro se* litigants are entitled to fair and equal treatment, *Whitaker v. Whirlpool Corp.*, 32 S.W.3d 222, 227 (Tenn. Ct. App. 2000), *pro se* litigants are not entitled to shift the burden of litigating their case to the courts. *Id*. at 222. *Pro se* litigants are not excused from complying with the same substantive and procedural requirements that must be adhered to by other represented parties. *Id*. at 222. We thus find that Mr. Moore was charged with the responsibility of offering a proper objection to the trial court's ruling at the February 21, 2003 hearing.

[4] To briefly address Mr. Moore's hearsay allegation, we note that neither he nor his counsel entered a proper and timely objection to Dr. Walker's report as inadmissible hearsay. Failure to interpose proper and seasonable objections to hearsay equals a waiver and statements or records that would likely be excluded under a proper hearsay objection become sufficient evidence absent such objection.

As a final note, we stress that Dr. Walker's report should have been made available to counsel where the court's decision was based, at least in part, upon this evaluation. Should Mr. Moore or Mrs. Holland, as the natural parents of these children, desire to read or review the contents of Dr. Walker's report, they should file a proper motion requesting the unsealing of said document.

## IX.

We next consider the related issue of whether the trial court "committed reversible error in requiring [Mr. Moore] to seek counseling for the [twins]." Mr. Moore is apparently challenging the trial court's April 25, 2003 order wherein the court found:

> [Dr. Walker's sealed] report suggests that the two children who are the subject of this litigation ("the twins") are in some emotional stress, and Dr. Walker recommends the assistance of a child psychiatrist or psychologist to help alleviate this stress. Mr. Moore will therefore make arrangements to take the children for counseling with possibly Dr. Cathy Griffin with the latter to determine the duration and intensity of the counseling. The adult parties to this case will make themselves available to attend such counseling if requested to do so by the counselor. Costs of such counseling that are not covered by insurance will be divided equally by Mr. Moore and Ms. Holland.

The court briefly discussed the need for continued counseling during the February 21, 2003 hearing without objection from Mr. Moore. We find that the trial court did not abuse its discretion in requiring Mr. Moore to seek further counseling for the twins. Dr. Walker's sealed report indicates that the twins, especially the young boy, have "had some significant problems adjusting emotionally to their new home." In his initial report dated October 18 and 22, 2002, Dr Walker noted that "[i]f undue distress persists after [the] transfer [of custody], appropriate consultation and/or counseling with a child psychologist should be sought." This report was entered as an exhibit at trial without objection, and was made available to both parties.

In her testimony at the February 21, 2003 hearing, Mrs. Holland stated that the twins were having a difficult time adjusting to the change in custody, noting:

> Q. Would you please tell [t]he Court generally how that visitation [with the twins] was going?
>
> A. At first, it was not very well at all. [The twins] had a lot of questions, they were, like, asking me "[W]hy do I have to go." And, you know, the – Your Honor has ordered us not to, you know, discuss the court with them, and my expression to them was that they're very lucky children, they have four people who love them very much.

THE COURT: I read that. I thought that was beautiful.

[Q. (MR. HILL):] And it –

THE COURT: Very good.

A. – was very difficult to – for – for [my twin daughter]. At first, she would go and hide. She – she got mad at [my twin son], actually, because he told on her hiding place, it was under the bunk bed.... So we went to try and find her, and she got awfully upset with – with [her brother] because he gave away her hiding spot.

But the – her – her reason for doing this is because she didn't want to go to Mr. and Mrs. Moore's house. She could not understand why she had to go. So I had to sit down and explain to her the best [way] that I could – possibly could.

[My son's] first visitation from Mr. and Mrs. Moore's house, he kicked me, he screamed [at me] and called me the B-word, which I have never ever in my entire life experienced out of my son.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

[My son] is not loving anymore, he does not just run up and say "I love you, mommy," like he used to do, or "I [missed] you."

[My daughter], she seems confused on calling me "mama" or [Mrs.] Moore "mama."

Mr. Holland testified that the twins are not initially as affectionate towards him and Mrs. Holland, or their stepsisters, during their visits, but noted that they warm to the family members after a couple of hours. Ms. Kaiser testified that the children are more withdrawn since the change in custody. No evidence was offered in rebuttal to this testimony.

On the basis of the above testimony and Dr. Walker's reports, we find that continued counseling is in the twins' best interests, and thereby conclude that the trial court did not abuse its discretion in requiring Mr. Moore to seek further counseling for the children. Mr. Moore's issue is therefore without merit.

## X.

We next consider Mr. Moore's argument that the trial court incorrectly calculated or based Mrs. Holland's child support obligations to appellant upon her 1999 income.

In its order of April 25, 2003, the trial court directed Mrs. Holland to pay to both Mr. Moore and Mr. Ray $311.00 per month in child support for support of her four children. The court's support award covered the twins and Mrs. Holland's two children with Mr. Ray, and was further based upon an income of $622.00 per month.

The only evidence in the record regarding Mrs. Holland's income is a single pay stub from her employer, Kessler Rehabilitation Services, listing her net bi-weekly income for the pay period ending December 7, 2002, as $757.59, and Mrs. Holland's base assertion that she makes $12.50 per hour. There is no evidence in the record to indicate the average number of hours that Mrs. Holland works per week, or that the pay stub submitted into evidence is representative of her bi-weekly earnings. There is no evidence in the record that either Mr. Moore or his attorney ever questioned Mrs. Holland as to her income at the time of this appeal.

Tennessee Code Annotated § 36-5-101(a)(1) (Supp. 2002) provides in pertinent part as follows:

> (a)(1) Whether the marriage is dissolved absolutely, or a perpetual or temporary separation is decreed, the court may make an order and decree for the suitable support and maintenance of either spouse by the other spouse, or out of either spouse's property, and of the children, or any of them, by either spouse or out of such spouse's property, according to the nature of the case and the circumstances of the parties, the order or decree to remain in the court's control; and, *on application of either party for spousal support, the court may decree an increase or decrease of such allowance only upon a showing of a substantial and material change of circumstances. In cases involving child support, upon application of either party, the court shall decree an increase or decrease of such allowance when there is found to be a significant variance, as defined in the child support guidelines established by subsection (e), between the guidelines and the amount of support currently ordered unless the variance has resulted from a previously court-ordered deviation from the guidelines and the circumstances which caused the deviation have not changed.* The necessity to provide for the child's health care needs shall also be a basis for modification of the amount of the order, regardless of whether a modification in the amount of child support is necessary.

(emphasis added).

Mr. Moore has presented no evidence of Mrs. Holland's exact or near-exact monthly or annual income, nor is there any evidence in the record to show a "substantial and material change of circumstances" such as to justify an increase in Mrs. Holland's child support obligations. We thus find Mr. Moore's issue without merit.

If any variance exists as required by the Child Support Guidelines, Tenn. Comp. R. & Regs. 1240-2-4, Mr. Moore may file a proper petition to modify Mrs. Holland's child support obligations. We note that Mr. Ray does not appeal the trial court's ruling regarding child support.

## XI.

Mr. Moore's final issue is whether he is entitled to recover attorney's fees from Mr. Ray for his appeal in this matter.

The record indicates that this matter has been prolonged unnecessarily by the parties by many petty and somewhat irrelevant issues. Although it appears that the parties do love these children, they have not shown a willingness to put the interests of these children first and set aside their individual animosity toward each other. Also, it seems that the apparent animosity of Mr. Moore's counsel toward the trial judge has added to the strife and inability of the parties to work things out. Considering the record as a whole, and the matters that have transpired, we do not find that the trial court abused its discretion in any manner in refusing to award attorney's fees to Mr. Moore.

## XII.

In conclusion, the trial court's order is reversed to the extent that it denies the request that the twin's surnames be changed to Moore and it is ordered that such change be made by the trial court on remand. The order of the trial court is affirmed in all other respects and costs of this appeal are assessed against the appellant, Stephen Eric Moore and his surety.

_____
W. FRANK CRAWFORD, PRESIDING JUDGE, W.S.